UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
|  ) | |
| *Plaintiff* ) | |
|  ) | |
| v. ) | Cause Nos. 3:18-CR-89-RLM |
|  ) | 3:18-CR-113-RLM |
| JUNIE CEPEDA IBARRA, ) | |
|  ) | |
| *Defendant.* ) | |

OPINION AND ORDER

On September 23, the day after hearing argument, the court of appeals reversed this court's denial of Junie Cepeda Ibarra's motion for compassionate release and issued an immediate mandate. The same day, Ms. Cepeda Ibarra filed an emergency motion for hearing or oral argument on her motion. I heard argument on September 26.[1]

*The February 8, 2022, Denial of Compassionate Release*

My February 8, 2022, order denying Ms. Cepeda Ibarra's motion left unclear whether I recognized my discretion to grant compassionate release regardless of Ms. Cepeda Ibarra's life expectancy. The order suggested I had felt constrained by Bureau of Prisons guidelines that refer to life expectancy but don't apply to compassionate release petitions filed in the district courts. It

---

[1] This opinion takes the unusual step of using the first person rather than "the court." The alternative makes it too wordy to clarify whether "the court" means the district court or the circuit court.

appeared to the court of appeals that I applied the wrong standard and so abused my discretion. I apologize for causing such puzzlement, and welcome the opportunity to clarify the reasoning behind the February ruling.

The February 22 order inartfully applied the test articulated in the court of appeals decision. The February 22 order didn't recite the test, and that contributed to concern that I might have applied some other test. As embarrassing as it to have to write a second opinion to explain the first, the shortcomings of the February 2022 opinion require that.

Some background is needed. This is Ms. Cepeda Ibarra's second petition for compassionate release under 18 U.S.C. § 3582(c)(1)(A). I denied her first motion in September 2021. She had argued that a variety of health conditions – her age (then 51), obesity, severe pulmonary arterial hypertension, asthma, severe sleep apnea, heart disease (with a history of myocardial infarctions), congestive heart failure, cerebrovascular accidents, transient ischemic attacks, and substance abuse disorder – placed her at high risk of a severe outcome if she contracted COVID-19. Ms. Cepeda Ibarra didn't appear to argue in her first motion that her many health conditions themselves constituted a compelling reason for release. She argued that the risk she faced from COVID-19 – increased significantly by her other health conditions – was the compelling reason. But she had already survived a bout with COVID-19 in December 2020 and had been vaccinated (with both doses) in the spring of 2021. On the strength of United States v. Broadfield, 5 F.4th 801 (7th Cir. 2021), I denied the motion because the fully vaccinated Ms. Cepeda Ibarra hadn't "demonstrated an extraordinary

2

and compelling reason for relief under the law as it is understood today." (Doc. 54, at 2).

Ms. Cepeda Ibarra filed this emergency motion for reduction in sentence or compassionate release on December 8, 2021, [2] the day after FCI Dublin Medical Director Dr. David Duncan had diagnosed her as having no more than 18 months to live. FCI Dublin was making arrangements for her family to visit within the week.

*Only One Compelling Reason Was Presented*

As I read the emergency motion (and still read it today), the motion was based entirely on Dr. Duncan's prognosis of a life expectancy of no more than 18 months (he actually said Ms. Cepeda Ibarra's systolic pulmonary artery pressure put her in a class of people whose mean survival was 8.4 months, but he was using a BOP form that asked specifically about 18 months). Her motion conceded that she had served only about 27 percent of her 151-month sentence, but cited several cases that had "determined that compassionate release is appropriate under similar conditions." (Doc. 62, at 8).

After some necessary back and forth about exhaustion of remedies within the Bureau of Prisons, I denied the emergency motion on February 8. The order's first sentence summarized Mr. Cepeda Ibarra's entire argument for

---

[2] Ms. Cepeda Ibarra moved for compassionate release in cause numbers 3:19-CR-89 and 3:18-CR-113. For simplicity, this order cites to docket entries in 3:19-CR-89.

3

compassionate release: "Junie Cepeda Ibarra believes she is going to die very soon and asks for an order of compassionate release so she can pass among loved ones rather than in prison." (Doc. 74, at 1).

By the time I ruled, Dr. Duncan's prognosis no longer stood as the only evidence. Dr. Elizabete Stahl, Medical Director for the Bureau of Prisons' Central Office of the Health Services Division (or someone producing the report under her name) had concluded that Ms. Cepeda Ibarra didn't have the sort of end-of-life indicators that would justify a prognosis of "terminal," which appears to have meant, "likely to live no more than 18 months." Recognizing that the inmate bears the burden of proving entitlement to compassionate release, United States v. Newton, 996 F.3d 485, 488 (7th Cir. 2021), I weighed each medical statement against the other: Dr. Duncan had seen Ms. Cepeda Ibarra personally, while Dr. Stahl hadn't, but Dr. Stahl had the benefit of Dr. Duncan's report and the reverse wasn't true. I found no basis on which to credit Dr. Duncan's opinion over Dr. Stahl's, leaving Ms. Cepeda Ibarra's burden to demonstrate an extraordinary and compelling reason for release unmet.[3] I referred to "18 months" only to explain

---

[3] The order applied the appropriate analysis but didn't recite it, perhaps reflecting the urgency of a 60-day old emergency motion. The parties' briefs indicated agreement with the test as I had articulated it when deciding Ms. Cepeda Ibarra's first motion: "A court can grant compassionate release if, but only if, the inmate has exhausted her remedies within the Bureau of Prisons, the inmate demonstrates extraordinary and compelling reasons for immediate release, and relief would be consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a). United States v. Gunn, 980 F.3d 1178 (7th Cir. 2020)." (Doc. 54, at 2).

Ms. Cepeda Ibarra's evidence and argument, not to suggest that I relied on BOP regulations.

### *"For That Reason and That Reason Alone"*

Unusual language in the February opinion obscured my reasoning:

> This record doesn't allow this court to find that Ms. Ibarra's life expectancy is less than eighteen months, or any other duration short enough to allow immediate release under 18 U.S.C. § 3582(c)(1)(A). *For that reason and that reason alone*, the court denies her petition for compassionate release.
> For the sake of any reviewing court, the court adds these findings, *while emphasizing they are not the basis of the court's ruling* . . .

(Doc. 74, at 2) (emphasis added).

The first quoted sentence reflected the first step of the two-step test to which the court of appeals referred: Ms. Cepeda Ibarra had presented a single ground for a finding of an extraordinary and compelling circumstance supporting release, and hadn't proven it, so I couldn't find the existence of such a circumstance. The second sentence completed the analysis (again leaving out the test itself): Ms. Cepeda Ibarra had to satisfy both prongs of the two-step test, and hadn't satisfied the first, so her claim had to be denied.

I specified that the failure to establish so reduced a life expectancy was the only basis for the ruling because health conditions are impermanent, and the future might bring an extraordinary and compelling reason for compassionate release. Dr. Stahl might come to believe Dr. Duncan had it right after all, or Ms. Cepeda Ibarra could return to this court with a renewed motion. Or Ms. Cepeda Ibarra's health might deteriorate in some other way. Or a future COVID-19

5

variant might threaten even a vaccinated but otherwise very vulnerable person. The opinion was written as it was to reflect the limited holding.

*The Odd Reference to § 3553(a) Factors While Not Citing § 3553(a)*

The third of the quoted sentences led into a brief discussion of the §3553(a) sentencing factors that courts must consider if compassionate release is to be granted. I found the evidence of extraordinary and compelling circumstance to be in equipoise. There's always a chance a reviewing court might see things differently, especially when the decision under review says the party with the burden of proof demonstrated a 50 percent chance but fell short of 50.1 percent. Under ordinary circumstances, a reviewing court that finds error in application of the extraordinary and compelling circumstance prong of the test would remand to the district court to make its decision under the second prong. But this was an emergency petition. Had I erred in deciding that Ms. Cepeda Ibarra hadn't shown that her demise was near, the court of appeals might want to take the extraordinary step of resolving the second prong itself. The summary of the § 3553(a) factors that followed the third quoted sentence was meant to facilitate such an effort, if the court of appeals chose to undertake it in the face of what might be an emergency.

*Post-Remand Reconsideration*

So ends the effort to explain the parts of the February 2022 opinion that left the opinion opaque. The court of appeals reversed and remanded for

6

reconsideration of Ms. Cepeda Ibarra's motion for compassionate release, so the court turns to the petition.

At Monday's hearing, Ms. Cepeda Ibarra's counsel vigorously challenged the weight that should be given to the Stahl report. He noted that the report was "signed" by a Megan Shaw rather than by Dr. Stahl, that the Stahl report didn't mention (much less consider) Dr. Duncan's report and opinion, and that the Stahl report contained factual inaccuracies (such as that Ms. Cepeda Ibarra was working at her prison work assignment) and inconsistencies (the report says her "medical conditions are considered chronic and progressive and are ultimately terminal," but then says in the next paragraph that she doesn't have the "indicators that would establish a prognosis of terminal at this time").

Those arguments are new to the district court. Ms. Cepeda Ibarra reported that she first learned of the Stahl report on January 7, when the government filed its (second, post-exhaustion) response to her emergency motion. Ms. Cepeda Ibarra filed no reply to the government's response and so never commented on the report in this court. Today's discussion of what she sees as the shortcomings of the Stahl report might have been helpful in February. For one thing, in deeming the expert reports a tossup, I said, "Dr. Duncan had the advantage of personal observation as the person directly in charge of Ms. Ibarra's care when he made his report, but by virtue of the order of the events, Dr. Stahl had the advantage of considering Dr. Duncan's opinion, while the reverse wasn't true." Today's argument shows that some of that understanding lacked

7

evidentiary basis: Dr. Stahl's report says nothing of Dr. Duncan's opinion or report.

But a closer examination of Dr. Duncan's report shows a lack of evidentiary support for the proposition that Dr. Duncan had the advantage of personal observation. His report speaks only of "A review of Ms. Cepeda-Ibarra's medical record . . . ." So what I saw as advantages each doctor had over the other might have simply been untrue. Closer examination also shows that Dr. Duncan's report might not conflict with Dr. Stahl's as much as first believed. Dr. Duncan's report says Ms. Cepeda Ibarra's life expectancy is 18 months or less *and/or* she has a disease or conditions with an end-of-life trajectory. The report is ambiguous as to whether just one criterion or both are met, and if only the second criterion is met, his report might accord with Dr. Stahl's.

Dr. Duncan and Dr. Stahl (under whose name the report was sent) largely agreed on Ms. Cepeda Ibarra's condition. They agreed that she suffered from progressive Pulmonary Arterial Hypertension and associated Congestive Heart Failure. Dr. Stahl actually listed more physical maladies than Dr. Duncan did. Their apparent disagreement came down to whether Ms. Cepeda Ibarra's maladies would kill her soon or, as Dr. Stahl said, it didn't look like the condition that would likely end her life some day would end her life within the 18 months that is important to the Bureau of Prisons. Even though Dr. Stahl didn't find end-of-life indicators, she noted that Ms. Cepeda Ibarra was to be transferred to a medical prison and could resubmit a request for compassionate release after treatment options were exhausted or her illnesses worsened

Ms. Cepeda Ibarra's attorney told me at Monday's hearing, as he told the court of appeals at last week's argument, that Ms. Cepeda Ibarra has received shockingly little treatment since her transfer. He reports that a pulmonologist saw her in April, but declined to prescribe a needed infusion because he didn't specialize in hypertension. He reports that Ms. Cepeda Ibarra hasn't seen a doctor since she was hospitalized in May for chest pains and abnormal EKG readings. It took months for her to get a CPAP machine, and she says she has been told it could take years to get the medical bed that was prescribed for her seven months ago. Those allegations are jarring to a judge who has been assured over 35 years of sentencings in which defendants sought downward variances based on health concerns that the Bureau of Prisons can handle all such concerns. Based on years of professional experience, I know that Ms. Cepeda Ibarra's attorney wouldn't knowingly make misrepresentations to the court. But Ms. Cepeda Ibarra isn't a reliable source of information. Her criminal record stretches back 30 years with crimes marked by dishonesty and false statement: grand theft, forgery, receiving stolen property, impersonation, and aggravated identity theft.

*Invitation for More Current Evidence*

Whichever was more right – the Duncan report or the Stahl report, both prepared last December – is stale in September 2022. More current information would be helpful, and might be necessary. Nearly ten months have passed since Ms. Cepeda Ibarra came to this court in fear that she was about to die in prison,

so the process should move as quickly as is reasonably possible. I will direct the United States to file under seal, by October 13, any diagnosis or prognosis relating to Ms. Cepeda Ibarra that has been prepared for FMC Carswell since Ms. Cepeda Ibarra's transfer to that facility. I stress that I don't want reports from treatments or observations containing only readings that I can't interpret without medical expertise. I want only post-transfer diagnoses and/or prognoses.

Given the emergency nature of Ms. Cepeda Ibarra's motion, I may rule without further argument after the government produces that information.

*Why the Continued Focus on Life Expectancy?*

It might seem macabre for the court to focus on whether a petitioner can be expected to live less than 18 months, or more. But that is the nature of this petition. In February, Ms. Cepeda Ibarra's life expectancy was the central issue: she wanted to go home to die among loved ones. The two medical reports before me were prepared with an eye toward the "18 months or less" life expectancy that is important to the BOP's decision-making. The 18-month time period was the language spoken in those exhibits. For my purposes on a compassionate release petition, there is no meaningful difference between 17 and 19 months, important as that difference might be to the BOP.

But the question before me remains whether, given her current health condition, Ms. Cepeda Ibarra faces a life expectancy so sharply reduced that her 151-month sentence should be reduced to time served. That question would remain critical even if I were to add a thumb to the scale, declare the evidence

no longer in equipoise, and find that Ms. Cepeda Ibarra has proven the extraordinary and compelling circumstance she alleged. Such a finding would take us to the second step of the inquiry – whether release is consistent with the statutory sentencing purposes – and the question of Ms. Cepeda Ibarra's life expectancy would remain central.

If Ms. Cepeda Ibarra might live for years (even in very poor health), the sentencing factors in 18 U.S.C. § 3553(a) would counsel heavily against early release. Her crimes – possession with intent to distribute methamphetamine, possession of stolen mail, wire fraud, and aggravated identity theft – were serious enough to produce an advisory guideline range of 151 to 212 months' imprisonment. This appeared to be the eighth separate time this defendant (then 48 years old) had been sentenced for felonies, and most of those sentencing events involved multiple counts. This crime spree began mere weeks after Ms. Cepeda Ibarra was released on parole from a sentence for similar crimes. Ms. Cepeda Ibarra was ill when she was sentenced and is more ill today, but she had been nearly as ill during her two-year crime spree. The sentencing memorandum commented, "One must marvel at her industriousness in light of what her loved ones understand of her health and physical condition." (Doc. 43, at 7). At sentencing, I found that Ms. Cepeda Ibarra appeared to pose a significantly above average risk of future criminal conduct. With nearly every sentencing factor disfavoring release, it would be difficult to order Ms. Cepeda Ibarra released after serving only about a third of her sentence.

On the other hand, I didn't sentence Ms. Cepeda Ibarra to die in prison. My exercise of discretion would change if Ms. Cepeda Ibarra proves to be a terminally ill woman with weeks to live; it might change if she proves to be a terminally ill woman with months to live. Since she hasn't yet persuaded me that her death is on the horizon, performing the second prong of the two-step test for compassionate release would be impossible. So, at least for now, my focus remains her life expectancy.

*Conclusion*

The court orders the United States to file with the court, under seal, by October 13, 2022, any diagnosis and/or prognosis relating to Junie Cepeda Ibarra prepared since her transfer to FMC Carswell, so the court can better evaluate her current medical condition. The court DEFERS ruling on Junie Cepeda Ibarra's emergency motion for reduction in sentence/compassionate release (Doc. 62) until then, and informs the parties that the court expects to rule without further argument after any medical records are submitted to the court.

SO ORDERED.

ENTERED: September 28, 2022

/s/ Robert L. Miller, Jr.
Judge
United States District Court

Cc: Clerk, U.S. Court of Appeals